UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
UNITED STATES OF AMERICA,        )
                                 )
          PLAINTIFF,             )
                                 )
          v.                     )          CIVIL ACTION
                                 )          NO. 18-11535-WGY
MYRLENE CHARLES,                 )
                                 )
          DEFENDANT.             )
_____)
```

YOUNG, D.J.                              April 22, 2020

**FINDINGS OF FACT, RULINGS OF LAW, AND
ORDER FOR JUDGMENT**

## I.    INTRODUCTION

I have been an active United States District Judge for 35 years, yet I have never before handled a denaturalization case. The Department of Justice is launching a new section for denaturalization cases, placing at the forefront cases of terrorists, war criminals, sex offenders, and also "other fraudsters" (the first out of two examples provided for fraud cases was a conspiracy to defraud a bank of millions of dollars).  The spirit of the new section, as was expressed by Assistant Attorney General Jody Hunt, is to prosecute the most serious criminals: "When a terrorist or sex offender becomes a U.S. citizen under false pretenses, it is an affront to our

system -- and it is especially offensive to those who fall victim to these criminals." See Press Release, U.S. Dep't of Justice, The Department of Justice Creates Section Dedicated to Denaturalization Cases (Feb. 26, 2020), https://www.justice.gov/opa/pr/department-justice-creates-section-dedicated-denaturalization-cases; Katie Benner, Justice Dept. Establishes Office to Denaturalize Immigrants, N.Y. Times (Feb. 27, 2020), https://www.nytimes.com/2020/02/26/us/politics/denaturalization-immigrants-justice-department.html. **Is this such a case?**

On July 23, 2018, the United States of America ("the government") commenced this action, seeking to revoke the citizenship of Myrlene Charles ("Charles"), who was granted lawful permanent residence status ("LPR") in 1998 and was naturalized in 2005. See generally Prelim. Statement Case ("Compl."), ECF No. 1; see also Trial Ex. 9, Form I-485 Appl. Register Permanent Residence; Trial Ex. 10, Form N-400 Appl. Naturalization; Trial Tr. Excerpt (Jan. 7, 2020) ("Trial Tr.") 28, 37, ECF No. 62.

The action turns upon Charles's alleged ineligibility for LPR (count 2) and commission of fraud or willful misrepresentation during the adjustment of status and naturalization (counts 1 and 3). Compl. ¶¶ 87-110. On September 20, 2018, Charles filed an answer and an affirmative

defense.  Answer, ECF No. 5.

On August 1, 2019, the government moved to deem requests for admission admitted and for an order drawing adverse inferences from Charles's invocation of the Fifth Amendment. Pl.'s Mot. Deem Reqs. Admis., ECF No. 28; Pl.'s Mem. Supp. Mot. Deem Reqs. Admis., Ex. A, Pl.'s First Set Req. Admis. ("Admissions"), ECF No. 29-1.  The Court granted the government's motion to deem its first set of requests for admission admitted as Charles failed timely to answer. Electronic Clerk's Notes, ECF No. 60.  As for the motion to draw adverse inferences from Charles's assertion of the privilege against self-incrimination, the Court allowed the parties the opportunity to argue the matter during the bench trial, and now renders its decision below.

On September 4, 2019, the government moved for summary judgment, which was denied.  Pl.'s Mot. Summ. J., ECF No. 31; Pl.'s Mem. Supp. Mot. Summ. J., ECF No. 32; Pl.'s Statement Material Facts ("Pl.'s SOF"), ECF No. 33; Def.'s Opp'n, ECF No. 38; Pl.'s Reply, ECF No. 39; Electronic Clerk's Notes, ECF No. 44.

During a two-day bench trial on January 7 and 14, 2020, the Court heard testimony from Michael Spaniol; Thomas L. Liszkiewicz, a fingerprinting expert; Mirella Tiberi ("Tiberi"), a senior official with the U.S. Citizenship and Immigration

Services ("USCIS")[1]; and Alcena Charlemont ("Charlemont"), Charles's ex-husband.  Electronic Clerk's Notes, ECF No. 60; <u>see</u> Trial Ex. 12, Expert Witness Report Thomas L. Liszkiewicz; Trial Tr. 5-6, 111-13.  After the government rested, Charles submitted a packet of USCIS regulations, manuals, administrative decisions, and answers to frequent questions, of which the Court took judicial notice.  Def.'s Closing Docs., ECF No. 64.  Having heard final arguments on the merits, this Court now makes the following findings of fact and ruling of law.

## II.   FINDINGS OF FACT[2]

### A.   Charles's Entry to the United States

On June 20, 1990, Charles arrived at Miami International Airport.  Admissions, No. 1; Trial Ex. 2, Form I-263 Record Sworn Statement Dated June 20, 1990; Trial Tr. 10.  Upon arrival, Charles presented the Immigration and Naturalization

---

[1] Tiberi was not involved in Charles's immigration process, but she is an experienced USCIS officer, whom the Court finds credible and knowledgeable on the common practice of USCIS throughout the nation.  Fed. R. Evid. 406.  The officers who were involved in the process did not testify.  In the instant case, the Court determines that such testimony is insignificant to the government's case.  The relevant documents are Charles's own statements under oath, which are clear on their face and require no personal knowledge.  Moreover, so many years have passed that the officers involved would likely not remember the particular events.  <u>See</u> <u>United States</u> v. <u>Santos</u>, 947 F.3d 711, 719 (11th Cir. 2020) (experienced officer testified instead of the officers involved in the defendant's immigration process).

[2] Beside the trial exhibits and transcript, the Court references what it deemed admitted under Admissions.

Service ("INS") officers a photo-switched[3] Haitian passport with the name Mimose Delphonse and a date of birth in October 1953. Admissions, No. 2; Trial Ex. 1, Haitian Passport No. 88465749; Trial Ex. 2; Trial Ex. 3, Form I-110, Notice Appl. Admis. Detain Hr'g; Trial Ex. 4, Form I-222, Notice Appl. Admis. Detain Hr'g; Trial Tr. 10-11, 15-17.  In accordance with her passport, Charles represented to immigration officials that her name was Mimose Delphonse and that she was born in October 1953 in Cayes, Haiti.  Trial Ex. 2.  INS recorded Charles's fingerprints on the above date.  Trial. Ex. 12.  As Charles was attempting to enter the country with a photo-switched passport without possessing a valid immigration visa, INS detained her and placed her into exclusion proceedings.  Trial Exs. 3, 4; Trial Tr. 16-17.

While in exclusion proceedings, on August 14, 1990, Charles applied for asylum under the name Ivierta Dastino.  Admissions, No. 11; Trial Ex. 5, Form I-589 Appl. Asylum Withhold Removal; Trial Tr. 19.  In her asylum application, Charles admitted using

---

[3] In a photo-switched passport, the photo depicts a person other than the one whose identity and details appear on the passport.  See Trial Tr. 11; White v. Holder, No. 4:11CV212-MP/WCS, 2011 WL 4809272, at *5 (N.D. Fla. Aug. 29, 2011), report and recommendation adopted, No. 4:11-CV-00212-MP-WCS, 2011 WL 4809330 (N.D. Fla. Oct. 11, 2011) ("A photo switched passport must necessarily show Petitioner's image, but must list a different name.").

both names, Ivierta Dastino and Mimose Delphonse.  Trial Ex. 5.
She also stated that she was born in May 1960 in Dauphin, Grande
Saline, Artibonite, Haiti.  Id.  On September 7, 1990, an
immigration hearing officer issued an order releasing Charles
from INS custody and granting Charles's motion to change venue
to New York, where she planned to reside.  Trial Ex. 6, Order
Mot. Change Venue; Trial Tr. 20.  On September 24, 1992, an
immigration hearing officer denied Charles's asylum application
and ordered her excluded and deported.  Admissions, No. 13;
Trial Ex. 7, Mem. Decision Order; Trial Tr. 20-21.  There is no
indication that Charles left the country under either of the
identities mentioned from the time the deportation order was
issued until the time she applied for LPR.  Pl.'s SOF ¶ 3.  On
her I-485 form, under the heading "Applicant's Residence Last
Five Years," Charles certified that she had resided in the
United States since 1990.  Trial Ex. 9.  Under the heading
"Applicant's Last Address Outside the United States of More Than
One Year," she stated "N/A."  Id.

Therefore, the Court finds that Charles remained in the
United States after she was ordered deported until she filed her
I-485.

**B.  Charles's Adjustment to LPR**

On March 12, 1993, a person named Antony Charles filed a
Form I-130 Petition for Alien Relative ("I-130"), as a LPR

[6]

seeking to have Charles classified as his unmarried daughter (classification F24), in order to grant her LPR status.  Trial Ex. 8, Form I-797 Notice Action; Trial Tr. 20-21, 31-33.  INS approved Antony Charles's petition in July 1993.  Trial Ex. 8. On May 25, 1996, Charles married Charlemont.  Admissions, No. 10; Trial Ex. 10 at 4; Trial Tr. 112-13.  On September 23, 1996, Antony Charles was naturalized and became a U.S. citizen.  Trial Ex. 14, Certificate Naturalization Antony Louis Charles.  On December 26, 1996, Charles filed her I-485 under the name "Myrlene Charles" premised on the approved I-130.  Admissions, No. 6; Trial Ex. 9.  Charles stated on her I-485 that she was born in May 1960 in Port-au-Prince, Haiti.  Trial Ex. 9 at 1. Charles represented that she had never been deported from the United States.  Id. at 3.  Moreover, Charles represented that she had never by fraud or willful misrepresentation of a material fact sought to procure entry to the United States or any other immigration benefit.  Id.  Charles signed her I-485 under penalty of perjury.  Id. at 4.  In 1997, Charles was interviewed regarding her I-485 application, where she represented that she was single and reaffirmed all her written answers on the I-485.  Admissions, No. 8, 9; Trial Ex. 9; Trial Tr. 27, 44-45.  On March 9, 1998, INS approved Charles's I-485 and she became a LPR.  Trial Ex. 9.

C.   **Charles's Naturalization**

On April 8, 2005, Charles applied for naturalization by filing an N-400 form ("N-400").  Trial Ex. 10; Trial Tr. 37. Charles represented in her N-400 that her name was Myrlene Charles.  Trial Ex. 10 at 1.  Charles also represented in her N-400 that she was born in May 1960.  Id. at 2.  Charles indicated her marriage to Charlemont since May 25, 1996.  Id. at 4. Charles printed "N/A" next to the question of whether she ever used other names.  Id.  She denied being detained by INS officers for any reason, and denied ever providing false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal.  Id. at 8.  Charles further denied ever lying to any U.S. government official to gain entry or admission into the United States.  Id.  In addition, Charles denied being ordered excluded or deported, and denied applying for any kind of relief from exclusion or deportation.  Id. at 9.

Charles signed her N-400 under penalty of perjury.  Id. at 10.  On September 6, 2005, Charles was interviewed by a USCIS naturalization officer, affirming orally and under oath the contents in her N-400.  Id. at 10, Trial Tr. 38.  At the end of the interview, Charles signed the N-400 again in front of the officer and certified the truth of the contents under penalty of perjury.  Trial Ex. 10 at 10.  During the naturalization process, Charles submitted fingerprints.  Trial Ex. 12.

According to the government's fingerprinting expert, Thomas Liszkiewicz, these fingerprints are identical to the fingerprints on file for Mimose Delphonse.  Id.  This Court adopts the expert's finding.

On September 6, 2005, USCIS approved Charles's naturalization application.  Trial Ex. 10 at 1.  On September 27, 2005, Charles took the oath of allegiance and was admitted as a citizen of the United States.  Trial Ex. 11, Certificate of Naturalization No. 29358213; Trial Tr. 41.

## III. RULINGS OF LAW

### A.   Charles's Invocation of the Fifth Amendment

In response to the government's interrogatories, requests for production, and during her deposition, Charles extensively invoked her right to remain silent, answering "I take the Fifth" to virtually every question and production request.  See Admissions, No. 3; Pl.'s Mem. Supp. Mot. Deem Reqs. Admis. ("Pl.'s Mem."), Ex. C, Dep. Tr. ("Deposition"), ECF No. 29-3. In turn, the government moved that this Court draw adverse inferences from Charles's blanket silence.  Pl.'s Mem. 7-11, ECF No. 29.

It is ultimately within the Court's discretion whether to allow this motion:

> [I]n a civil proceeding, the drawing of a negative
> inference is a permissible, but not an ineluctable,
> concomitant of a party's invocation of the Fifth

Amendment.  While the law does not forbid adverse
inferences against civil litigants who refuse to
testify on Fifth Amendment grounds, it does not mandate
such inferences.  When all is said and done, the trial
court has discretion over whether a negative inference
is an appropriate response to the invocation of the
Fifth Amendment in a particular civil case.

In re Carp, 340 F.3d 15, 23 (1st Cir. 2003) (internal citations
omitted).

This Court declines to draw negative inferences from
Charles's utilization of her constitutional privilege in a
denaturalization proceeding where the government is charged with
a heightened burden of proof, Fedorenko v. United States, 449
U.S. 490, 505 (1981) (proof "must be 'clear, unequivocal, and
convincing' and not leave 'the issue in doubt'" (citations
omitted)); the stakes for the nonmoving party are overwhelming,
Costello v. United States, 365 U.S. 265, 269 (1961) ("American
citizenship is a precious right.  Severe consequences may attend
its loss, aggravated when the person has enjoyed his citizenship
for many years."); and the government is not "unduly
disadvantaged," Serafino v. Hasbro, Inc., 82 F.3d 515, 518 (1st
Cir. 1996).

This Court has already deemed admitted the First Set of
Requests for Admission due to Charles's untimely response to the
government's questions.[4]  Additionally, the government has been

---

[4] In United States v. Klimavicius, the First Circuit held
that while default judgment in denaturalization is improper,

able to present live testimony and exhibits, including Charles's
sworn statements.  Together, these provide the government with
sufficient material to build its case.  Thus, Charles's
assertion of the privilege has not unduly disadvantaged the
government, tilting the balance in favor of safeguarding the
Fifth Amendment protection:

> We reiterate that the balance must be weighed to safeguard
> the Fifth Amendment privilege: the burden on the party
> asserting it should be no more than is necessary to prevent
> unfair and unnecessary prejudice to the other side.  As
> correctly delineated by the district court in this case,
> "the Fifth Amendment privilege should be upheld unless
> defendants have substantial need for particular information
> and there is no other less burdensome effective means of
> obtaining it."

Serafino, 82 F.3d at 518 (internal citations omitted).

Therefore, the motion is denied.

### B.    The Standard of Review in Denaturalization

A court ought revoke United States citizenship and cancel a
Certificate of Naturalization if (1) the citizenship and
Certificate were "illegally procured" or (2) the person obtained
naturalization by "concealment of a material fact or by willful
misrepresentation."  8 U.S.C. § 1451(a).  United States
citizenship is said to be "the highest hope of civilized men"
and it "would be difficult to exaggerate its value and

---

other sanctions for non-compliance with discovery orders are
permissible, e.g., deeming certain facts admitted while allowing
the defendant to rebut such evidence at trial.  847 F.2d 28, 35
(1st Cir. 1988).

importance."  Schneiderman v. United States, 320 U.S. 118, 122

(1943).  This "right once conferred should not be taken away

without the clearest sort of justification and proof."  Id.  The

Supreme Court has explained:

> [T]he right to acquire American citizenship is a
> precious one and that once citizenship has been
> acquired, its loss can have severe and unsettling
> consequences.  For these reasons, we have held that the
> Government "carries a heavy burden of proof in a
> proceeding to divest a naturalized citizen of his
> citizenship."  The evidence justifying revocation of
> citizenship must be "'clear, unequivocal, and
> convincing'" and not leave "'the issue in doubt.'"  Any
> less exacting standard would be inconsistent with the
> importance of the right that is at stake in a
> denaturalization proceeding.

Fedorenko, 449 U.S. at 505-06 (internal citations omitted).

On the other hand, "the Supreme Court has consistently held that

'[n]o alien has the slightest right to naturalization unless all

statutory requirements are complied with.'"  Koszelnik v.

Secretary of Dep't of Homeland Sec., 828 F.3d 175, 179 (3d Cir.

2016) (alteration in original) (quoting United States v.

Ginsberg, 243 U.S. 472, 475 (1917)).  Thus, the Supreme Court

has required "strict compliance with all the congressionally

imposed prerequisites to the acquisition of citizenship" and

held that "[f]ailure to comply with any of these conditions

renders the certificate of citizenship 'illegally procured,' and

naturalization that is unlawfully procured can be set aside."

Fedorenko, 449 U.S. at 506 (quoting 8 U.S.C. § 1451(a)).

[12]

Notably, once the government overcomes the requisite burden of proof, district courts lack any discretion to avoid ordering denaturalization.  Id. at 517; Klimavicius, 847 F.2d at 32 ("[D]istrict courts lack equitable discretion to refrain from revoking a certificate of naturalization once the government has proven illegal procurement."); United States v. Hsu, 695 F. App'x 393, 396 (10th Cir. 2017).

### C.  Count 1: Illegal Procurement of Naturalization by Commission of Fraud or Willful Misrepresentation at the LPR Process

To succeed on this count, the government must show that Charles fraudulently or willfully misrepresented material facts to unlawfully procure her LPR, leading to illegal procurement of her naturalization as well.[5]  Pl.'s Mem. 11; 8 U.S.C. §§ 1182(a)(6)(C)(i), 1427(a)(1), 1451(a); see Toribio-Chavez v. Holder, 611 F.3d 57, 62-63 (1st Cir. 2010); United States v. Zajanckauskas, 441 F.3d 32, 37 (1st Cir. 2006); Mejia-Orellana v. Gonzales, 502 F.3d 13, 16 (1st Cir. 2007) (deferring to Board of Immigration Appeals interpretation holding that, for purposes of cancellation of removal, an alien who "acquired permanent

---

[5] "[N]o person shall be naturalized unless such person has been 'lawfully admitted [to the United States] for permanent residence.'  8 U.S.C. § 1427(a)(1).  To meet that standard, an individual must be in possession of a valid visa and be legally eligible for that visa."  United States v. Zajanckauskas, 441 F.3d 32, 37 (1st Cir. 2006) (second alteration in original) (citing Fedorenko, 449 U.S. at 515).

resident status by fraud or misrepresentation" has "not been
lawfully admitted for permanent residence").

### 1. Misrepresentations

"A misrepresentation is a statement of fact that is untrue
or a failure to disclose a fact in response to a specific
question." United States v. Hirani, 824 F.3d 741, 748 (8th Cir.
2016) (quoting Shipley v. Arkansas Blue Cross & Blue Shield, 333
F.3d 898, 904 (8th Cir. 2003)).

The government presented ample evidence showing that from
the time she entered the United States in 1990 until becoming a
LPR in 1998 Charles repeatedly gave false statements to
immigration officials and concealed facts from them, including
under oath and under penalty of perjury.  Charles represented
under penalty of perjury that she had never been deported from
the United States, Trial Ex. 9 at 3-4, failing to disclose that
she was ordered deported several years earlier.  Admissions, No.
13; Trial Ex. 7; Trial Tr. 21.  Charles also represented under
penalty of perjury that she had never, by fraud or willful
misrepresentation of a material fact, sought to procure entry to
the United States or other immigration benefit, Trial Ex. 9 at
3-4, failing to disclose that she sought to procure entry to the
United States by presenting a photo-switched passport containing
a different identity to immigration officials at the airport.
Admissions, No. 2; Trial Ex. 1-4; Trial Tr. 10-11, 15-17.

Further, in her 1997 interview regarding her I-485 application, Charles represented that she was single and reaffirmed her written answers on the I-485 form, Admissions, Nos. 8-9, Trial Ex. 9, Trial Tr. 27, failing to disclose her marriage to Charlemont in May 1996, which preceded the interview and even the filing of her I-485.  Admissions, Nos. 6, 10; Trial Ex. 9; Trial Ex. 10, at 4; Trial Tr. 112-13.

### 2.  Materiality

"In assessing materiality, the test is whether the misrepresentation 'had a natural tendency to influence' the INS's decisions."  Toribio-Chavez, 611 F.3d at 63 (quoting Kungys v. United States, 485 U.S. 759, 772 (1988)).  "[F]inding that a misrepresentation is material does not require concluding that it necessarily would have changed the relevant decision."  Injeti v. U.S. Citizenship & Immigration Servs., 737 F.3d 311, 316 (4th Cir. 2013).  To determine the natural tendency of a misrepresentation to affect a decision under § 1451(a), the question is "what would have ensued from official knowledge of the misrepresented fact" rather than "what would have ensued from official knowledge of inconsistency between a posited assertion of the truth and an earlier assertion of falsehood."  Kungys, 485 U.S. at 775.

"[A] person whose lies throw investigators off a trail leading to disqualifying facts gets her citizenship by means of

those lies -- no less than if she had denied the damning facts at the very end of the trail."  Maslenjak v. United States, 137 S. Ct. 1918, 1929 (2017).  "A misrepresentation is material if it 'tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded.'"  Koszelnik, 828 F.3d at 180-81 (quoting Matter of Kai Hing Hui, 15 I. & N. Dec. 288, 289 (B.I.A. 1975)).  This can be done through "conflicting representations and documentation provided by the applicant," which frustrates "appropriate investigation and vetting."  Mann v. Holder, No. 1:12-CV-1926 AWI BAM, 2014 WL 4795032, at *6 (E.D. Cal. Sept. 25, 2014); see United States v. Alrasheedi, 953 F. Supp. 2d 112, 114 (D.D.C. 2013) (holding that defendant committed material misrepresentation by denying in application for LPR ever having used other names, and by omitting any mention of a prior asylum application or order of removal); United States v. De Lucia, 256 F.2d 487, 490 (7th Cir. 1958) (holding that concealment of identity in naturalization process was material "inasmuch as concealment of one's true name is an effective impediment to an investigation or inquiry").

    Here, the misrepresentations were material as they had a natural tendency to affect the immigration officers' decision-making about Charles's status.  Charles's lies and concealment

covered up disqualifying facts that would have precluded her from gaining LPR as well as citizenship.

### a. The Marriage

If the truth about her marriage had been revealed before she adjusted her status under a category reserved for unmarried persons, Charles's application would had been denied.  That is because the act of marriage automatically revoked the application based on that specific category, and because no other application under a different category was ever filed on Charles's behalf.  Trial Tr. 33, 54, 62, 64; see 8 C.F.R. § 1205.1.  USCIS needed neither initiate any action nor acknowledge the marriage because the revocation was automatic.  See Trial Tr. 33, 41-42, 48, 109.  Charles presented herself single throughout the LPR process, thus blinding the adjudicator to the disqualifying fact of marriage.  Trial Ex. 9; Trial Tr. at 44.  As a result, she also prevented the adjudicator from employing his discretion to determine if granting a waiver would be appropriate under the circumstances.  Charles's LPR, regardless the approval stamp, was void ab initio.

To challenge the materiality of hiding the marriage from the authorities, Charles contends that she could easily fit into alternative categories for LPR, e.g., under her U.S. citizen husband or U.S. citizen father.  The problem is no actual alternative application or notification was ever filed in her

case, and the Court cannot speculate how USCIS would have decided under its broad discretion.  Trial Tr. 54, 62.  <u>See</u> Closing Docs. 33 (explaining that in order for a LPR to upgrade her beneficiary's I-130 after becoming a U.S. citizen, she must notify the government); <u>see also</u> Trial Tr. 103.[6]  Also, Charles married in May 1996, several months before her father became a U.S. citizen in September 1996.  Trial Ex. 14.  Thus, the I-130 was already automatically revoked by the act of marriage before Charles's father gained the special status allowing an upgrade. Trial Tr. 109.  A new action on Charles's behalf was required to revive her immigration process; however, this was never done.

At trial, Charlemont testified that Charles's father told him, in 1996, that Charles's lawyer stated there was no need for Charlemont to apply on Charles's behalf because she was already approved under her father's sponsorship.  Trial Tr. 114-16. This hearsay statement (to which no objection was raised) could arguably show Charlemont's state of mind, but not Charles's, since she was not a party to this conversation.  Notably, the application was still pending in 1996.  Charles attended the preapproval interview in 1997 and the application was approved only in 1998.  Trial Ex. 9.

---

[6] It is not entirely clear what difference the upgrade would have made, since Charles was married and only unmarried children under age 21 receive preferential access to visas.  <u>See</u> Closing Docs. 33.

Additionally, Charles claims that her then-lawyer was incompetent because he did not advise her to "convert" her application or to file an alternative one following her marriage to a U.S. citizen.  This is mere speculation, as this Court has no admissible evidence regarding the lawyer's conduct.  There is no evidence that the lawyer was aware of the marriage that happened a few months before the submission of the I-485.  The lawyer did not write any answer to the question about the marital status on the I-485, which was left blank.[7]  Charles herself answered the question orally in her interview in 1997. See Trial Ex. 9 at 2; Trial Tr. 27, 44-45.

In any event, even were Charles able to convert her sponsorship, that, in itself, could not cure her other misconduct and misrepresentations she committed during her immigration process.  The Court now analyzes these other matters.

### b.    The Use of a Fraudulent Passport and the False Statements to the Government

Had Charles not concealed the illegal use of a fraudulent passport to gain entry to the United States, as well as the use

---

[7] This Court did not see any evidence or heard any argument regarding the practice of lawyers to leave some unanswered questions on application forms.  Thus, the Court is not equipped to decide whether it was appropriate or negligent to do so here. Charles's application was processed, suggesting it was fine to leave this one question to be answered later in the interview.

of another identity to request asylum and the fact that she had been ordered deported under that identity, she likely would have been disapproved.  Because Charles was ordered deported (which is equivalent to being ordered removed[8]) under the name Iviarta Dastino, INS had no authority to grant her an immigration benefit such as the LPR status under a different name.  See United States v. Alindor, No. 18-12586, 2020 WL 132442, at *3 (11th Cir. Jan. 13, 2020) ("[O]nce an alien has been ordered removed, USCIS has no authority to grant the alien immigration benefits under a different name.").  At trial, Tiberi testified that had Charles admitted having a prior order of deportation, an adjudicator would have asked follow-up questions to determine eligibility.  Trial Tr. 40.  Tiberi further testified that she would not immediately approve an application had the applicant previously presented a photo-switched passport to unlawfully gain entrance to the United States.  Trial Tr. 30, 47-49.

Charles contends that the evidence is insufficient to prove she used the fraudulent passport to gain entry because there is no indication as to exactly when she presented it to officials and whether it was attached to the benefit of gaining entry to the United States.  She also argues that she immediately asked

---

[8] Instead of "deportation," Congress now uses the term "removal."  See Calcano-Martinez v. I.N.S., 533 U.S. 348, 350 n.1 (2001).

for asylum to show she did not intend to use the fraudulent passport to be admitted to the United States.

Charles's claims do not hold water.  Charles was deemed to admit that she "attempted to enter the United States using a Haitian Passport under the name of Mimose Deiphonse." Admissions, No. 2.  Additionally, the notice of her detention clearly states she was being detained because she "sought to enter the United States by fraud . . . [and] presented a photoswitched . . . Haitian Passport."  Trial Ex. 3.  Moreover, Charles did not apply for asylum "immediately".  She was detained in June 1990, but submitted the asylum application a couple of months later in August 1990.  Trial Exs. 3-5.  The Court cannot seriously credit Charles's claim that she obtained the Haitian Passport lawfully through the Haitian Consulate, when the passport contains her photo while the name, date, and place of birth are different than those she provided in her LPR and naturalization process.  Trial Exs. 1, 9, 10.

Charles claims that the government is responsible for erroneously granting her the LPR, as it failed to investigate and to match fingerprints.

This claim cannot stand.  Charles's concealment of material facts caused it to deem such an investigation unnecessary.  At the relevant time, the fingerprinting system was not as fully computerized and automatic as it is today and

[21]

was activated only upon specific suspicion.  Trial Tr. 79.
Likewise, the Attorney General at the time had no apparent
reason to commence rescission[9] of her LPR as a result, once
again, of Charles's misconduct.

### c.    The Court Cannot Usurp the Government's Discretion Regarding Waivers

To show that her misrepresentations and concealment were
not in fact material, Charles claims that several waivers were
available to her.  The problem is Charles did not apply for any
of them.  The grant of waivers is within USCIS' or the Attorney
General's discretion, Trial Tr. 76, and the Court cannot step
into their shoes.  Otherwise, it could give unfair leverage to
those who do not apply for waivers for whatever reason.
Accepting Charles's argument would also disregard the
requirement to charge the applicant for a waiver with the burden
of proving eligibility to the appropriate tribunal.  A decision
by INS' Administrative Appeals Office, which Charles has
provided to the Court, <u>see</u> Closing Docs. 27-30, states: "In
proceedings for an application for waiver of grounds of

---

[9]   "If, at any time within five years after the status of a
person has been otherwise adjusted . . . to that of an alien
lawfully admitted for permanent residence . . . it shall appear
to the satisfaction of the Attorney General that the person was
not in fact eligible for such adjustment of status, the Attorney
General shall rescind the action taken granting an adjustment of
status . . . ."  8 U.S.C. § 1256(a).

inadmissibility under section 212(i) of the [Immigration and Nationality] Act, the burden of proving eligibility remains entirely with the applicant." In re: Applicant, 2013 WL 8284909, at *3 (INS Oct. 1, 2013) (citing 8 U.S.C. § 1361). Tiberi testified that an applicant must demonstrate extreme hardship in order to obtain a 212(i) waiver and multiple factors ought be considered. Trial Tr. 35, 69-70. Tiberi agreed that in Charles's case the USCIS could consider that Charles came from Haiti, a country associated with extreme poverty, wars, and lack of medical care. Id. at 72. Tiberi also agreed that some asylum applicants who flee persecution would often need to take extreme measures like fabricating documents, and the government will sometimes grant them a waiver. Id. at 73-74. All that notwithstanding, Charles did not apply for this particular waiver. The Court cannot speculate what would have happened if Charles's did, especially since the decisions in waivers are subjective to every adjudicating officer and the discretion is so broad. See Gina L. Signorelli, Immigration Waivers and the Psychological Effects on Family Members Throughout Their Loved One's Legalization Process, 46 S.U. L. Rev. 195, 213 (2019). Notably, Charles's asylum application stated she was persecuted in her country, Haiti, and this application was nevertheless denied. Thus, it is doubtful that she could have obtained this type of waiver. Trial Ex. 5.

Tiberi also testified that USCIS officers may, in their discretion, approve the I-485 in spite of an applicant's deportability with a section 237(a)(1)(H) waiver.  Trial Tr. 104; see San Pedro v. Ashcroft, 395 F.3d 1156, 1157-58 (9th Cir. 2005) ("Although there are nondiscretionary eligibility elements that must be met under § 237(a)(1)(H) . . . the ultimate authority whether to grant the waiver rests entirely in the discretion of the Attorney General.") (internal citation, quotation marks, and alteration omitted).[10]  In addition, Tiberi testified that when an applicant files an I-601 form to receive a waiver for fraud or willful misrepresentation, it may be considered in the officer's discretion.  Trial Tr. 31.  As a prerequisite for this waiver, however, the applicant first must admit to committing the fraud.  Id. at 50.

The immigration authorities treat aliens more favorably, finding no fraud under 8 U.S.C. § 1182(a)(6)(C)(i), when despite using fraudulent documentation to arrive to the United States, upon their arrival, they immediately surrender the false documents to the U.S. immigration officials and reveal their true identity before applying for asylum.  See Bueno v.

---

[10] Although in the Fu case, referenced by Charles, the Board of Immigration Appeals ruled the applicant to be statutorily eligible for the waiver, the discretion ultimately rested with the Attorney General.  Accordingly, the case was remanded "for further consideration of his waiver application."  In re Guang Li Fu, 23 I. & N. Dec. 985, 988 (BIA 2006).

Davidson, No. 14-CV-23654, 2018 WL 7077958, at *5 (S.D. Fla. May
16, 2018)(citing Matter of D-L & A-M, 20 I. & N. Dec. 409 (BIA
1991)); In re Kasinga, 21 I. & N. Dec. 357 (BIA 1996); Matter of
Y-G, 20 I. & N. Dec. 794 (BIA 1994)).  Here, however, Charles
did not voluntarily surrender her false document and did not
reveal her true identity.  It is therefore unlikely the
discretionary waiver or waivers would have been granted.

      **d.   "Without Inspection" Waiver**

Finally, Charles certified in her I-485 that she last
entered the United States without inspection, seeking and
obtaining a waiver for this fault specifically.  This was,
however, yet another means to conceal her deportation order and
the fraudulent behavior that preceded it.  Trial Ex. 9; Trial
Tr. 67-68.  As Tiberi testified, "without inspection" would
apply to applicants who do not have documentation to prove they
were inspected upon entering the United States.  Here, not only
was Charles inspected, she was heavily inspected upon the
discovery of her fraud, ultimately resulting in her being
ordered deported.

Charles's suggestion that her attempt to gain entry using
another identity could be viewed as entry without inspection is
illogical and baseless.  As opposed to fraudulently passing
inspection, a person who evades inspection "did not attempt to
obtain a visa or any other documentation from immigration

officials, nor was she seeking to be admitted into the United States, as she was already in the country after having entered without inspection."  See In re: Applicant, 2013 WL 8284909, at *2; Closing Docs. 29.  Charles, in contrast, sought to gain admission to the United States by fraud.

Charles's claim that this kind of waiver is commonly considered a forgiveness program for all kinds of unlawful entries, rather than only for persons who entered without inspection, lacks any factual basis.  Charles refers to a single sentence from the USCIS website.  See Closing Docs. 19, Ex. B, Green Card Through LIFE Act (245(i) Adjustment) (aliens may adjust their status "regardless of: The manner they entered the United States").  Later in the same document, however, under the heading "Adjustment of Status Under Section 245(i) of the INA and LIFE Act Provisions," it unequivocally states that this waiver is not amnesty or forgiveness, and it may not prevent deportation or other consequences of unlawful presence in the United States.  U.S. Citizenship & Immigration Servs., Green Card Through LIFE Act (245(i) Adjustment), https://www.uscis.gov/greencard/life-act-245i-adjustment (last visited Mar. 5, 2020).[11]

---

[11] Courts may take judicial notice of the contents of federal agencies' websites that are not subject to reasonable dispute. See Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010).

Therefore, the Court finds that the government has met the heavy burden to show that the misrepresentations were material.

### 3.    The "Willful" Element

"[T]he 'element of willfulness is satisfied by a finding that the misrepresentation was deliberate and voluntary.'" Toribio-Chavez, 611 F.3d at 63 (quoting Mwongera v. I.N.S., 187 F.3d 323, 330 (3d Cir. 1999) and citing Parlak v. Holder, 578 F.3d 457, 463-64 (6th Cir. 2009)).  "An intent to deceive is not necessary; rather, knowledge of the falsity is sufficient."  Id. (citing Forbes v. I.N.S., 48 F.3d 439, 442 (9th Cir. 1995); see Wen Zhong Li v. Lynch, 837 F.3d 127, 131 (1st Cir. 2016).  "The government is not required to prove intent to deceive, but rather must demonstrate only that an applicant willfully made a representation that does not accord with the facts."  United States v. Hirani, 824 F.3d 741, 749 (8th Cir. 2016) (citing Espinoza-Espinoza v. I.N.S., 554 F.2d 921, 925 (9th Cir. 1977)); see Parlak, 578 F.3d at 463.  In Hirani, the applicant's false representation of his name, under penalty of perjury, demonstrated that the misrepresentation was willful.  824 F.3d at 749.

Here, there is sufficient evidence of willfulness.  Charles knew the representations were false; some of the misstatements

are about personal facts[12] that Charles must have known, such as

her date and place of birth, her use of other names, and her

marital status.  See Bazzi v. Holder, 746 F.3d 640, 646 (6th

Cir. 2013) ("[The applicant] knew the reality of his marital

status and for him to have conveyed any impression to the

contrary . . . was to willfully misrepresent the truth."); see

also Toribio-Chavez, 611 F.3d at 63.  Moreover, the fact that

Charles moved the immigration court for a change of venue shows

she knew of the deportation proceedings.  See Trial Ex. 6.

Additionally, Charles was aware that she used a passport

containing her photo but not her own personal information.

Charles presented the immigration officials the false passport,

---

[12] Charles cites Nowak and Maisenberg for the proposition
that the government's evidence regarding events that happened
many years ago should be scrutinized with the utmost care,
suggesting that the government's evidence here should be
discredited.  See Nowak v. United States, 356 U.S. 660 (1958),
Maisenberg v. United States, 356 U.S. 670 (1958).  While it is
always a good idea to scrutinize evidence with the utmost care -
- indeed it is this Court's consistent aspiration -- this case
is highly distinguishable from Nowak and Maisenberg.  In the
above-mentioned cases, the evidence in question consisted of the
live testimony of witnesses about equivocal expressions made
years prior.  Here, the evidence consists mostly of government
records, including statements under oath, as well as the
testimony of an officer regarding immigration processes and an
explanation of the documentation.  The only live testimony, that
of Charles's ex-husband, sought to establish the fact of their
marriage.  Also, the court in Nowak determined that the question
to which Nowak answered that the government considered a
misrepresentation was vague, so Nowak's answer could not be a
misrepresentation.  See Nowak, 356 U.S. at 663-65.  Here,
questions about marital status, names, place of birth, and the
like, are clear.

she was barred admission, and then was denied asylum and ordered deported.  Trial Exs. 1, 3, 4; Admissions, Nos. 2, 13; Trial Tr. 15-17.  "A person who knowingly presents a false passport as if it were genuine has engaged in a willful misrepresentation." Ymeri v. Ashcroft, 387 F.3d 12, 18 (1st Cir. 2004) (citing Esposito v. I.N.S., 936 F.2d 911, 912 n.1 (7th Cir. 1991)).

Furthermore, the repetition and consistency of the misrepresentations as to specific subjects -- e.g., indicating she had never been ordered deported, never lied to the government, and never misrepresented to procure immigration benefits both in her I-485 and N-400 -- negate a finding of mistake.  The fact that Charles was under penalty of perjury served to put her on notice of the importance of truthful answers and to avoid unintentional misstatements.  What's more, during the interviews with officials Charles went through her answers on the I-485 and N-400 and could have changed any inaccurate answers, but she did not.  Trial Tr. 27-29.  Charles had multiple opportunities to rescind, but she chose not to do so.  Finally, any suggestion that Charles's misstatements were due to poor English skills should fail, as Charles's I-485 was filled by a lawyer on her behalf.  Trial Ex. 9; Trial Tr. 104.

### 4.   Procurement of Citizenship

The last element the government must prove is that Charles procured citizenship as a result of her misrepresentation or

concealment.  See Kungys, 485 U.S. at 767.  "At the end of the day, then, the government only wins if it shows that the citizen misrepresented a material fact and it is 'fair to infer that the citizen was actually ineligible.'"  United States v. Mensah, 737 F.3d 789, 808 (1st Cir. 2013) (quoting United States v. Latchin, 554 F.3d 709, 714 (7th Cir. 2009) & Kungys, 485 U.S. at 784 (Brennan, J., concurring)).  The standard is not whether the application would have been denied "but for" the misrepresentation, but whether a court could fairly infer the applicant would have been ineligible.  Id. at 809.

As noted above, due to her marital status, Charles was ineligible to apply for LPR under a category reserved only for unmarried individuals.  At the time she applied, Charles could not have legally acquired LPR status and consequently she could not have been naturalized.  See Trial Tr. 32-33, 41-47, 5-64.  Thus, it is fair to infer that Charles was granted the immigration benefit of LPR status as a result of her misrepresentation that she was single, despite being ineligible.  See Hirani, 824 F.3d at 752 ("Because [the applicant's] material misrepresentations concealed his statutory ineligibility to naturalize, [he] procured his naturalization on the basis of those misrepresentations.").

Further, if Charles's immigration history dating back to the early 1990s -- when she presented the fraudulent passport at

the airport and was later ordered deported under other identities -- was known to immigration officials, these acts of fraud would have afforded them the discretion to deny Charles's immigration benefits.  See Trial Tr. 11-18, 30-31, 40-49, 76, 104; see also United States v. Alindor, No. 8:17-CR-270-T-33MAP, 2018 WL 1705647, at *4 (M.D. Fla. Apr. 9, 2018), aff'd, No. 18-12586, 2020 WL 132442 (11th Cir. Jan. 13, 2020) (holding, in a criminal denaturalization context,[13] that when an applicant "did not reveal in her naturalization paperwork or interview that she . . . had been ordered deported, a reasonable jury could conclude beyond a reasonable doubt that [she] procured her naturalization by those false statements.").  "In short, when the defendant misrepresents facts that the law deems incompatible with citizenship, her lie must have played a role in her naturalization."  Maslenjak, 137 S. Ct. at 1928-29.

This Court thus finds that the government has met its heavy burden of demonstrating clear, unequivocal, and convincing evidence, that Charles illegally procured her citizenship by willfully misrepresenting material facts at the adjustment of status phase.

---

[13] "[T]he civil and criminal statutes both require a material misrepresentation and procurement of citizenship." United States v. Latchin, 554 F.3d 709, 713 (7th Cir. 2009).

**D.   Count 3: Procurement of U.S. Citizenship by Concealment of a Material Fact or Willful Misrepresentation at the Naturalization[14].**

This count focuses on the naturalization process and, similar to count 1, "contains four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." Kungys, 485 U.S. at 767; see Pl.'s Reply ¶¶ 12-13.

The government has proved that during the naturalization process, on her N-400, and in the following interview, Charles misrepresented and concealed under penalty of perjury her past use of different names, Trial Ex. 10, at 4, 10, as well as her immigration history, including her detention, asylum petition, and deportation order, id. at 8-10.  Additionally, Charles falsely claimed, under penalty of perjury, to have never provided false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal.  Id.

---

[14] The Court addresses count 3 before count 2, as count 3 requires analysis virtually identical to count 1.

The same analysis for count 1 applies here regarding materiality, willfulness, and procurement.  See Hirani, 824 F.3d at 749-50 (internal citation omitted) (concealment of identity under penalty of perjury was willful and material); United States v. Singh, No. CV 17-7214 (SRC), 2018 WL 305325, at *5 (D.N.J. Jan. 5, 2018) (false statements and concealments under penalty of perjury were willful).  To become eligible for naturalization, Charles had to prove her English proficiency or to qualify for an exemption.[15]  On her N400 she checked "no" when asked if she needed a waiver for the English requirement.  Trial Ex. 10 at 2.  Thus, Charles clearly understood what she was asked and could answer accurately, but chose otherwise.

As for procurement, like in count 1, Charles's concealment and lies hid her ineligibility to adjust status, which is a prerequisite for naturalization.  Thus, it is fair to infer that Charles's misconduct was the reason she was naturalized despite her disqualification.

Therefore, the Court finds that the government has shown clear, unequivocal, and convincing evidence that Charles illegally procured her citizenship by willfully misrepresenting material facts during her naturalization process.

---

[15] See U.S. Citizenship and Immigration Serv., Policy Manual, https://www.uscis.gov/policy-manual/volume-12-part-e-chapter-2 (last visited Mar. 5, 2020).

### E.    Count 2: Illegal Procurement of Naturalization - Not Lawfully Admitted for Permanent Residence

At oral argument, the government asserted that under count 2, the law requires no culpability whatsoever on the part of a defendant who failed to strictly comply with the naturalization requirements.  As the Court has already found grounds for denaturalization under counts 1 and 3, and absent any binding precedent agreeing with the government,[16] this Court will not address count 2.  The Court, however, is troubled by the government's interpretation of the law and rejects it.  This Court is reluctant to adhere to the view of the several courts that any innocent, technical problem with the immigration process must result in denaturalization.  Cf. Koszelnik, 828 F.3d at 180.  The stringent burden of proof on the government's shoulders, which resembles the criminal burden of proof,[17] along

---

[16] The Court finds that while some of the cases listed on the government's Notice of Additional Authority, ECF No. 65, are simply not persuasive, others are inapplicable as they involve defendants who were determined ineligible because of commission of serious crimes.  To this Court, such circumstances differ dramatically from the current case of non-fault ineligibility.

[17] As stated in Klapprott v. United States:

[B]ecause of the grave consequences incident to denaturalization proceedings we have held that a burden rests on the government to prove its charges in such cases by clear, unequivocal and convincing evidence which does not leave the issue in doubt. This burden is substantially identical with that required in criminal cases-proof beyond a reasonable doubt.

with the harsh consequences of a revocation of citizenship that may surpass criminal sanction,[18] are inconsistent with this stance.  Moreover, the natural reading of the statute suggests that the conduct under "illegal procurement" ought be as serious as "willful misrepresentation" or fraud, simply because it is offered as an alternative.  Why would the same law that targets blameworthy acts, such as fraud, also target innocent errors?  In his concurring opinion in Kungys, Justice Stevens observed that by adding "illegal procurement" to the statute, Congress intended to include severe crimes other than fraud or willful misrepresentation that nonetheless warrant denaturalization (e.g., rape).  See 485 U.S. at 799 n.11 (Stevens, J., concurring in the judgment).  Justice Stevens then refused to construe "illegal procurement" to encompass "trivialities" and

---

335 U.S. 601, 612 (1949) (internal citation omitted).

[18] See Klapprott, 335 U.S. at 611 ("Denaturalization consequences may be more grave than consequences that flow from conviction for crimes."); see also Schneiderman, 320 U.S. at 122:

> This is not a naturalization proceeding in which the Government is being asked to confer the privilege of citizenship upon an applicant.  Instead the Government seeks to turn the clock back twelve years after full citizenship was conferred upon petitioner by a judicial decree, and to deprive him of the priceless benefits that derive from that status.  In its consequences it is more serious than a taking of one's property, or the imposition of a fine or other penalty.

insignificant non-compliance with the naturalization process.

Id.  This view resonates with the Court.[19]

## IV.   CONCLUSION

For these reasons, the Court finds and rules that on counts 1 and 3, the government has met its heightened burden of proof, showing clearly, unequivocally, and convincingly that Charles's naturalization was procured unlawfully by concealment and misrepresentation of material facts at the adjustment of status and the naturalization stages.  Since the Court has no equitable discretion in this matter, an order of denaturalization must be entered.

The Court makes the following acknowledgment.  Charles is a sixty-year-old woman who has lived half her life in the United States.  She works as an accountant and, since she was naturalized fifteen years ago, has been a law-abiding American citizen.  There is no contention to the contrary.  Charles committed a low-level fraud.  In a case such as this, to truly administer justice, the legal tools of statute of limitations and judicial discretion are most needed, yet absent.  See United

---

[19] Although the Supreme Court in Fedorenko ruled that any failure to satisfy a statutory requirement may justify stripping of citizenship, see Fedorenko, 449 U.S. at 514, it never said that the defendant's mental state is unimportant to the consideration.  Notably, the Supreme Court found that Fedorenko committed willful misrepresentation.  See id.

States v. Rebelo, 394 F. App'x 850, 853 (3d Cir. 2010) (federal
catch-all limitations period did not apply to denaturalization
proceeding).  Curiously, civil denaturalization has a more
responsible sibling in criminal denaturalization.  Criminal
denaturalization provides much more protection to the
naturalized citizen.  First, there is a statute of limitations
of ten years.  See United States v. Chahla, 752 F.3d 939, 946
n.6 (11th Cir. 2014) (noting that 18 U.S.C. § 3291 provides a
ten-year statute of limitations for violations of § 1425).
Second, the government must prove its case beyond a reasonable
doubt.  See Mensah, 737 F.3d at 809.  Third, all criminal law
safeguards apply, including the right to a jury trial and the
Fifth Amendment protection against self-incrimination.  See e.g.
id. at 792.  Under this legal regime, it may be more
advantageous for the government to be less diligent, to wait
until the passage of ten years, in order to commence civil
denaturalization instead of the stricter criminal process.  For
the law to condone this opportunity for governmental abuse of
power is a promotion of injustice.  Civil and criminal
denaturalization are substantively comparable, as both may arise
from the same conduct (e.g., providing false statements to the
government in naturalization process as in Maslenjak); both
require similar legal analysis (see supra note 12); and the
relief the government seeks is often the same -- revocation of

[37]

citizenship.  See Schneiderman, 320 U.S. at 122 (noting that denaturalization may be more harsh than a criminal penalty: "In its consequences it is more serious than a taking of one's property, or the imposition of a fine or other penalty."); Maslenjak, 137 S. Ct. at 1918; United States v. Djanson, 578 F. App'x 238, 241 (4th Cir. 2014).  Therefore, the same handy legal tools, especially a statute of limitations, are warranted in both actions.  The Court is concerned that the law presently allows this disparity.

Judgment will enter for the government as follows:

1) Charles's United States citizenship is revoked and the Order of United States District Court of Massachusetts, sitting in Boston, Massachusetts, dated September 27, 2005 admitting Charles to citizenship is vacated.  Charles's Certificate of Naturalization No. 29358213 (the "Certificate"), issued pursuant to that Order, is cancelled and void.

2) Charles is permanently enjoined from claiming any rights, privileges, benefits, or advantages related to her September 27, 2005 naturalization.

3) Charles shall surrender and deliver, within ten days of entry of judgment, the Certificate and all copies thereof in her possession and make good faith efforts to recover and surrender copies in possession of others, to the Attorney General.

[38]

4) Charles shall surrender and deliver, within ten days of entry of judgment, any other indicia of U.S. citizenship, including any U.S. passports and voter registration cards, and all copies thereof in her possession and to make good faith efforts to recover and surrender copies in possession of others, to the Attorney General.


**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE